FILED

10/11/2018

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 16, 2018 Session

STATE OF TENNESSEE v. LAURA L. BEASLEY

Appeal from the Criminal Court for Sumner County
No. 2015-CR-649   Dee David Gay, Judge
_____

No. M2017-00591-CCA-R3-CD
_____

The Defendant, Laura L. Beasley, pled guilty in the Sumner County Criminal Court to vehicular homicide by intoxication, a Class B felony, and two counts of vehicular assault, Class D felonies, with the sentences to be determined by the trial court. Following a sentencing hearing, the trial court imposed sentences of ten years, three years, and three years, respectively, to be served consecutively in the Department of Correction. On appeal, the Defendant challenges the length of sentences imposed, the imposition of consecutive sentences, and the denial of an alternative sentence. After review, we affirm the sentencing decision of the trial court.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Shyanne C. Riddle (on appeal) and Andrew B. Love (at hearing), Nashville, Tennessee, for the appellant, Laura L. Beasley.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Lawrence Ray Whitley, District Attorney General; and Sidney Preston, Assistant District Attorney General, for the appellee, State of Tennessee.

OPINION

FACTS

The Defendant was charged with vehicular homicide by intoxication, two counts of vehicular assault, driving under the influence ("DUI"), DUI – child endangerment, and

violation of the implied consent law as a result of her crashing into another vehicle on May 15, 2015. After losing a motion to suppress her statements to police, the Defendant negotiated a plea agreement in which she pled guilty to vehicular homicide by intoxication and two counts of vehicular assault in exchange for a sentence of no more than sixteen years to be determined by the trial court following a sentencing hearing. The DUI and DUI – child endangerment charges merged into the vehicular homicide and vehicular assault convictions, and the violation of the implied consent law charge was dismissed.

If the case had gone to trial, the State's proof would have shown that the thirty-one year-old Defendant was driving her vehicle with her two-year-old son in the backseat. The Defendant crossed the centerline of the highway and struck a vehicle driven by Samantha Williams and occupied by Mrs. Williams' daughter, Adrianne Gentry, and Ms. Gentry's boyfriend, Nicholas Townsend. Mr. Townsend died at the hospital, and Mrs. Williams and Ms. Gentry suffered multiple injuries. The Defendant failed a field sobriety test and refused to comply with the implied consent law. After a search warrant was obtained for a blood draw, it was determined that the Defendant had a blood alcohol level of .119 percent approximately two hours after the accident.

The trial court conducted a sentencing hearing on February 24, 2017. In the presentence report that was admitted into evidence, the Defendant reported that she began drinking alcohol when she was seventeen or eighteen years old and would typically consume "around 8 beers a day several times a week." She admitted to years of drug use, involving marijuana, cocaine, heroin, Ecstasy, and one instance of LSD use. The Defendant reported that she had been in short-term treatment programs twice, the first in 2012 and the second in late 2014/early 2015. She said that she had begun attending Alcoholics Anonymous meetings since being incarcerated. The presentence report revealed that the Defendant had prior misdemeanor convictions for violation of the legend drug law, failure to appear, and a traffic offense. She had also been afforded what appears to be unofficial diversion on charges of possession of heroin and possession of drug paraphernalia – the notation to the charges indicating that they were retired and would be dismissed in one year if there were no further problems.

The Defendant reported that she was diagnosed as bipolar when she was eighteen years old and, although given medication, she quit taking it because she "didn't like how it made her feel[.]" She said that she needed treatment for her alcohol problem because "her drinking has progressively gotten worse." With regard to her family, the Defendant stated, "Growing up I used to fight with my parents. I have a great relationship with my parents and family. Most of [the] problems I've had with my family [are] due to my addiction."

At the sentencing hearing, Trooper Adam Grinder, with the Tennessee Highway Patrol, testified that he arrived at the scene of the accident around 10:30 p.m. on May 15, 2015. The Defendant said that she had drunk one twenty-four ounce beer. When Trooper Grinder informed the Defendant of Mr. Townsend's death, she showed no emotion. However, the Defendant became upset when Trooper Grinder would not let her get a cigarette from her wrecked vehicle, and she was later seen laughing about something with the other arrestees in the holding cell.

Detective Jason Williams, with the Portland Police Department and husband of victim Samantha Williams, testified that Mr. Townsend had been dating his daughter and he had come to like Mr. Townsend very much. Detective Williams recalled that on the night in question, he and Mrs. Williams, his other daughter Alexis Williams, Ms. Gentry, and Mr. Townsend were returning home after volunteering at a Special Olympics event. He was driving his vehicle with Ms. Alexis Williams, while Mrs. Williams followed behind him in her vehicle with Ms. Gentry and Mr. Townsend. As they were driving, Detective Williams saw the Defendant's vehicle in the opposite lane of travel going "in excess of the speed limit." As was his habit as a police officer, Detective Williams tried to observe the Defendant's vehicle in his rear view mirror as it passed him. He lost track of the vehicle, which initially made no sense to him, until he realized that the Defendant had crossed the centerline and hit his wife's car.

Detective Williams testified that he immediately turned around and called 911. As he approached the wreck, Detective Williams noticed that his wife's car was unrecognizable. He could hear his wife and daughter inside, but he heard nothing from Mr. Townsend. His wife and daughter sustained numerous injuries but survived. However, Mr. Townsend sustained a "massive head injury" and did not survive. Mrs. Williams's 2010 Nissan Cube was totaled. Detective Williams said that the accident had a "devastating" effect on his family and "totally altered the trajectory of all [their] lives."

Samantha Williams testified that she was fond of Mr. Townsend and that the accident had devastated her family. She recalled that Mr. Townsend was set to graduate from high school the next day, and he was trying to figure out a way to do that and help with a Special Olympics event at the same time. Mrs. Williams stated that she tried to avoid the Defendant's car when she saw it coming toward her but was unable to do so. After the crash, she saw that Mr. Townsend's "head was split open and his brains were coming out," and she tried to keep her daughter from looking at him. She asked about the driver of the other car and learned that alcohol was involved. Mrs. Williams sustained a broken finger, busted nose, and numerous burns and bruises.

Mrs. Williams testified that as a result of the accident, she was "terrifie[d]" to drive at night. She does not attend holiday events knowing that drunk drivers will be on

the road. She has nightmares about what happened and replays it "over and over in [her] head all the time." Her daughter had to seek counseling, and Mrs. Williams thought that the accident had "pushed" her daughter away from her a bit.

Adrianna Gentry was in the car with her mother when the accident occurred. She was a freshman in high school at the time, and Mr. Townsend was a senior. She recalled that Mr. Townsend "had so much pride in his country, and he was a great individual, and he was caring for . . . just anyone[.]" Ms. Gentry gave her account of the accident, including her seeing the extent of Mr. Townsend's injuries. She sustained broken ribs and a bruised lung in the crash. Despite having counseling, she has panic attacks, a hard time concentrating in school, experiences nightmares, and suffers from post-traumatic stress disorder.

Alexis Williams was riding with her father when the accident occurred. She read a statement into the record detailing the devastating effect the accident had on her and her family.

John Griffith testified that he knew Mr. Townsend through Mr. Townsend's involvement in the Sumner County Young Marines, of which Mr. Griffith was the executive officer. Mr. Griffith read a statement into the record in which he related his grief over the loss of Mr. Townsend and how a promising future had been cut short by the Defendant's "terrible decision[.]"

Summer Wims, Mr. Townsend's older sister, read a statement into the record in which she detailed the array of emotions she experienced as a result of Mr. Townsend's death and the impact his death had on her.

Tonya Reid, Mr. Townsend's mother, provided the court with a number of photographs of her son, showing him with his siblings and preparing to graduate from high school. Ms. Reid read a lengthy statement into the record, relating the devastating effect that her son's death had on the family and how she would "never see [her] amazing son accomplish all he had set out to do."

Next, the Defendant called witnesses on her behalf. Janelle Lawson testified that she and the Defendant were childhood friends but still kept in touch with each other. Ms. Lawson described the Defendant as a timid and quiet person but always willing to help. Ms. Lawson said that she never saw the Defendant drink or use drugs when they were in high school, but she and the Defendant drank alcohol when the Defendant visited Ms. Lawson at college. The Defendant never said anything to her about having a drug or alcohol problem.

Ashley Beasley, the Defendant's older sister, testified that she and the Defendant were raised in a "peaceful and loving" home. She said that growing up, the Defendant was a shy and quiet person who preferred to stay at home. Ms. Beasley described the Defendant as "a very loving, caring person" and not "a heartless, aggressive person." Ms. Beasley never saw the Defendant drink alcohol in high school. The Defendant did not begin making poor choices in life until she met Michael Curtis, with whom she eventually had a son. Ms. Beasley said that Mr. Curtis used drugs, and she recalled an instance when Mr. Curtis "dumped" the Defendant at the hospital after a drug overdose. Ms. Beasley described Mr. Curtis as "a very mean person" and noted that he "trashed" the Defendant's apartment on one occasion. Ms. Beasley did not know if the Defendant suffered from a mental illness, but she noted that the Defendant had always been self-conscious about her weight and appearance. Ms. Beasley was aware that the Defendant had been in a drug treatment program a number of years before the incident in this case. She believed that the Defendant would do well in "a super structured environment" where she was drug-tested, had a curfew, and received counseling.

On cross-examination, Ms. Beasley acknowledged that despite being close with the Defendant, she did not know about the Defendant's admitted drug and alcohol use beginning at the age of seventeen or eighteen. Ms. Beasley said that after the Defendant's drug overdose in 2008, her family took steps to get the Defendant into treatment, but she did not recall any specifics other than the Defendant went into rehab at some point. Ms. Beasley conceded that no one forced the Defendant to use drugs and alcohol; rather it was the Defendant's choice.

Joel Beasley, the Defendant's father, testified that the Defendant was a very quiet child who kept to herself but was eager to help out around the house. She was only average as a student and an athlete; however, she tried as hard as she could to excel. He admitted that the Defendant was not very social in high school and did not handle stress well, which caused him and his wife some concern. When the Defendant was in her late teenage years, Mr. Beasley and his wife began to worry that the Defendant had some kind of emotional or mental illness because she spent "way too much time in her room" and was not "blossoming, changing, getting ready for the real world[.]" Mr. Beasley recalled that the Defendant had several jobs over the years, with the most recent being with a home cleaning company.

Mr. Beasley testified that he did not allow alcohol in his home and did not think that the Defendant used drugs or alcohol until she began dating Michael Curtis, who appeared to have influence over her. Mr. Beasley recalled the Defendant's nearly dying of a drug overdose. When the Defendant got pregnant with Mr. Curtis's baby, she moved in with her parents and "did great through the pregnancy[,]" delivering a healthy baby boy. Some point later, Mr. Curtis overdosed on drugs and died, and the Department of

Children's Services ("DCS") got involved and placed the Defendant's baby in emergency custody of Mr. Beasley and his wife. The Defendant was living with them at the time of the accident in this case, and they watched her to make sure she went to work and came home on time. They saw no evidence, in the form of behavior or physical signs, that she was using drugs.

Mr. Beasley testified that on the day of the accident, the Defendant's baby was being cared for by another couple while he went to a job interview and the Defendant went to work. The Defendant was supposed to pick up her son at the end of her work day. Mr. Beasley became concerned when the Defendant did not arrive home by 7:00 p.m., but he learned from the Defendant around 9:30 p.m. that she had been delayed because her son was playing with another child and was now on the way home. A short while later, Mr. Beasley received a phone call from the Defendant saying that she had been in an accident. When he talked to the Defendant later that night, she was very upset that someone had been badly injured. Mr. Beasley hypothesized that the reason the Defendant refused to comply with the implied consent law was because she had been advised by a lawyer during the situation with DCS to "[n]ever agree to do anything."

Mr. Beasley acknowledged that the Defendant had been in a thirty-day treatment program a couple of times and had also obtained counseling at a Christian counseling center on three or four occasions. However, he thought she needed a more structured program. Mr. Beasley had no personal knowledge of whether the Defendant suffered from specific mental health problems, but the Defendant told Mr. Beasley's wife that she had been diagnosed as bipolar.

On cross-examination, Mr. Beasley admitted that he was unaware that the Defendant stated in her presentence report that she used alcohol and marijuana when she was seventeen or eighteen and was using cocaine and Ecstasy in 2004. He said that he "[a]bsolutely" would have gotten the Defendant into treatment had she come to him seeking help, but she had not done so. Mr. Beasley acknowledged that he and his wife were given emergency custody of the Defendant's son after the incident where Michael Curtis overdosed, and the Defendant and her son were with him at the time. Mr. Beasley was not aware that the Defendant was using heroin with Mr. Curtis when he overdosed and died. With regard to the night of the accident, Mr. Beasley agreed that it was dangerous for the Defendant to have her son in the car while she was drinking. Asked if he agreed with the Defendant's statement in her presentence report that she frequently fought with him and his wife while in high school, Mr. Beasley said that he did not understand that statement but that "every . . . family has fights."

The Defendant testified that she felt "[a]wful" about the accident and wished that she "could take it all back." The Defendant recalled that on the day of the accident, she

had gotten up early to take her son to the babysitter and then went to work cleaning homes. When she got off work, she bought two twenty-four ounce beers and drank one in the parking lot of the convenience store before going to pick up her son. The babysitters had taken her son out to dinner, so she drank the other beer while waiting for them to get back. She said that she was not using any drugs and had not done so since her last time in rehab. After picking up her son, she got confused about how to get home because she was not familiar with the area. She was looking at her GPS device and when she looked up, she saw headlights and "tried to jerk out of the way[,]" but hit the victims.

The Defendant explained Trooper Grinder's testimony that she had asked for a cigarette and did not act concerned that someone had been seriously hurt by saying that she did not know exactly what had happened at the time, was in a state of shock, and needed a cigarette to calm down. She explained that she refused to consent to a blood test because she had "never been put in that position" and "figured [she] needed to refuse until [she] had a lawyer."

The Defendant testified that she is shy and gets very nervous in front of people. Around the age of thirteen, she started to hate her appearance and feel like she was not "good enough for anything." She began to cut herself on her legs and then progressed to anorexia by the age of seventeen or eighteen. Her family got her into counseling, but she just threw up whatever she ate. She also began experimenting with drugs and alcohol with friends around the age of seventeen or eighteen. She met Michael Curtis in her early twenties and was initially unaware that he used drugs. When she found out, she nevertheless continued dating him because he was her first real boyfriend. She started using drugs with him not long after that. She believed that her mental illness made her susceptible to drug use because she had poor coping skills and using drugs made her "feel numb to all the things that made [her] feel so horrible." In time, her drug use progressed to intravenous use. As her and Mr. Curtis's drug addiction worsened, their relationship deteriorated to where he would assault her and destroy her property. Nevertheless, after getting pregnant by Mr. Curtis and having an abortion, she and Mr. Curtis later ended up having a child together. She moved in with her parents when she became pregnant the second time and eventually broke up with Mr. Curtis. When her son was around two years old, she and her son were with a friend named Josh Estes when Mr. Estes overdosed and died. She called 911, which precipitated DCS stepping in and taking her son away from her.

The Defendant said that she would like to get treatment and "be a productive person in society[.]" She believed that her past attempts at treatment were not effective because she did not get help with her mental health issues. She said that her mother once told her that mental illness ran in her family and that she "probably should get help[.]" She took Paxil for a time and attended some therapy sessions when she was eighteen or

- 7 -

nineteen, but she "didn't respond well" to the therapy. The Defendant said that she knew she would go back to using drugs after her first stay in short-term rehab, but she stopped using drugs after her second stay because she wanted to get her son back. Since being incarcerated, she had learned that she was suffering from depression and anxiety and was prescribed Celexa, which had "helped some." She applied to a long-term treatment program called Mending Hearts and heard that she had been accepted.

On cross-examination, the Defendant said that she did not recall telling the presentence report officer that she used to fight with her parents due to her drug use when she was growing up. Instead, she asserted that she had a "great" relationship with her parents. She admitted that she never talked to her parents about getting help with her addiction but said that she talked to them "a little bit" about her mental health. She agreed that she had been sporadically employed since graduating from high school.

The Defendant testified that she went to a short-term treatment facility for the first time in 2012 after her first drug arrest and that was the only time she attempted to get mental health treatment. She admitted that she could have gotten help if she had asked and that throughout her life there had been multiple warning signs that she needed to get help. She went to a short-term treatment facility for a second time in December 2014. However, she admitted that she only attended a few Alcoholics Anonymous meetings after leaving the facility. She also admitted that the car accident in this case occurred only five months after her discharge from treatment and that it was her drinking that caused the crash. She said that she continued to drink because she could not deal with the death of her friend Mr. Estes. However, she asserted that she now wanted to seek treatment and raise her son.

With regard to the evening of the accident, the Defendant admitted that she had at least three, possibly four, twenty-four ounce beers between 7:46 p.m. and 10:00 p.m. She agreed that it was her impairment and not looking at the GPS that was the cause of the accident.

After the conclusion of the testimony and hearing arguments from both parties, the trial court made lengthy findings in determining the Defendant's sentence. The court observed that the Defendant was making excuses and trying to shift responsibility.

In determining the length of the individual sentences, the court found as enhancement factors that: the Defendant had a previous history of criminal convictions or criminal behavior, based on her past drug use and misdemeanor convictions; the personal injuries inflicted on the victims were particularly great, based on the property damage resulting in two destroyed cars; and the Defendant had no hesitation about committing a crime when the risk to human life was high, noting that the Defendant admitted to

drinking four, twenty-four ounce beers and then driving with her young son in the car. The court found no applicable mitigating factors. The court noted that, pursuant to State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008), it was also considering whether the imposition of the sentence was justly deserved in relation to the seriousness of the offense; whether the punishment was sufficient to prevent crime and promote respect for the law; and the Defendant's potential for rehabilitation or lack thereof. The court found that the crime was very serious, resulting in one death, two injuries, and the potential for injury to the Defendant's son. The court recalled a number of recent cases before the court involving vehicular deaths or injuries. Citing statistics that someone was killed by a drunk driver every fifty minutes, the court determined that the deterrent effect of a sentence was great. As to potential for rehabilitation, the court found that the Defendant "had ample opportunities in [her] life to get help" and that it took her killing someone to realize that she was ready to get help. However, the court noted that "it just seems a little less truthful or from the heart, after you're back in jail and you want to get out." Based on all these factors, the court imposed midrange sentences of ten years for the vehicular homicide conviction and three years for each of the vehicular assault convictions.

As to consecutive sentencing, the trial court rejected the State's assertion that the Defendant was an offender with an extensive record of criminal activity. However, the court agreed with the State's contention that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime when the risk to human life was high and made extensive findings in that regard.

Regarding alternative sentencing, the trial court determined, pursuant to Tennessee Code Annotated section 40-35-103, that the Defendant's sentences would be served in confinement. The court found that confinement was necessary to protect society by restraining a defendant who has a long history of criminal conduct given the Defendant's "lifestyle of criminal conduct" and her "violat[ion] [of] the law every single day that [she] use[d] and possess[ed] illegal drugs." The court also found that confinement was necessary both to avoid depreciating the seriousness of the offense and as a deterrent, for the reasons previously stated regarding the increasing number of such cases before the court. The court lastly found that the Defendant had gotten out of a treatment program just months before the accident.

Accordingly, the trial court ordered that the Defendant's sentences be served consecutively, for an effective term of sixteen years, in the Department of Correction.

## ANALYSIS

On appeal, the Defendant argues that the trial court imposed an excessive sentence by: failing to consider any mitigating factors; applying certain enhancement factors; ordering consecutive sentencing; and imposing a sentence of confinement rather than an alternative sentence.

A trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. This standard of review also applies to "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012).

The Defendant asserts that the trial court should have considered her remorse, admission of guilt, diagnosed depression, and voluntary efforts to seek help with her

substance abuse as mitigation in determining her sentence. She also challenges some of the factors used by the trial court to enhance her sentence, asserting that "if the facts that establish the elements of the offense charged also prove the enhancement factor, the enhancement factor may not be used to increase punishment."

With regard to the factors the Defendant asserts the court should have considered in mitigation, we note that the court found that the Defendant's assertions of remorse and getting treatment while in jail were motivated by her desire to reduce her sentence. In addition, the court was aware of the Defendant's assertion of mental illness and, as its province, either found the assertion to be incredible or simply not providing mitigation because she never sought meaningful mental health treatment prior to the crime. Additionally, we note that, while the Defendant did plead guilty, she negotiated a sentence cap that afforded her some relief from a lengthier sentence.

The Defendant asserts that "because serious bodily injury and death are elements of the offenses charged," her sentence could not be enhanced based on the "personal injuries inflicted upon [the victim] . . . [being] great." However, the trial court based the application of this enhancement factor on the amount of property damage sustained by the victims. See State v. Danny Ray Dunn, No. E2012-00677-CCA-R3-CD, 2013 WL 1225788, at *5 (Tenn. Crim. App. Mar. 27, 2013). With regard to the court's finding that the Defendant had no hesitation about committing a crime when the risk to human life was high, we note that the Defendant's actions caused a direct risk to the lives of people other than the victims. In any event, the Defendant's long history of unlawful drug use qualifies as prior criminal behavior and supports the enhancement of the Defendant's sentences. Upon review, we discern no abuse of discretion in the trial court's imposition of mid-range sentences.

The Defendant also disagrees with the trial court's imposition of consecutive sentencing based on its finding her a dangerous offender. A trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that one or more of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) applies, including the one found by the instant trial court, that the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. Tenn. Code Ann. § 40-35-115(b)(4). When the court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

The Defendant argues that there were insufficient aggravating circumstances to support consecutive sentencing. However, the record supports the trial court's dangerous offender finding. The Defendant, having a long history of substance abuse and prior failed attempts at treatment, drove while intoxicated with her two-year-old son in the car and caused a head-on collision with tragic consequences and, afterwards, showed no concern for the victims and appeared only to be interested in getting cigarettes. Her admission of drinking 3-4 twenty-four ounce beers within two and a half hours of putting her son in the car is simply stunning. Her behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. The trial court also made both of the requisite Wilkerson findings. It first determined that consecutive sentencing was necessary to protect the public given the Defendant's long history of drug use, prior overdoses, loss of custody of her child, prior failures at rehabilitation, sporadic employment, and prior misdemeanor convictions. The court next determined that consecutive sentencing reasonably related to the severity of the offenses in that "the repercussions, the effects of [the Defendant's actions] will last not lifetime, but lifetimes, generation[s], plural."

In any event, the trial court would have been justified in imposing consecutive sentencing based on the Defendant's extensive record of criminal activity. This court has repeatedly held that "[c]urrent offenses may be used in determining criminal history for the purposes of consecutive sentencing." State v. Carolyn J. Nobles, No. M2006-00695-CCA-R3-CD, 2007 WL 677861, at *12 (Tenn. Crim. App. Mar. 7, 2007) (citing State v. Cummings, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992)); see, e.g., State v. Kyle Ronald Fencl, No. M2012-1265-CCA-R3-CD, 2013 WL 3976060, at *8 (Tenn. Crim. App. Aug. 5, 2013), perm. app. denied (Tenn. Nov. 13, 2013); State v. Darius Jones, No. W2010-01080-CCA-R3-CD, 2011 WL 2162986, at *3 (Tenn. Crim. App. May 26, 2011), perm. app. denied (Tenn. Sept. 21, 2011). Moreover, this factor includes criminal behavior as well as convictions, see State v. Dickson, 413 S.W.3d 735, 748-49 (Tenn. 2013), and the Defendant's long-term drug use certainly constitutes criminal behavior.

With regard to alternative sentencing, the Defendant argues that the trial court erred in failing to begin its determination with a rebuttable presumption that she was a favorable candidate for such. The Defendant then essentially disagrees with the trial court's reasons for its determination that her sentence be served in confinement.

We initially note that under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. Carter, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a

favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" Tenn. Code Ann. § 40-35-102(6).

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. Id. § 40-35-303(a). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he is a suitable candidate for probation. Id. § 40-35-303(b); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527. Also relevant is whether a sentence of probation would unduly depreciate the seriousness of the offense. See State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997); Bingham, 910 S.W.2d at 456.

To qualify for consideration for punishment in the community, an offender must meet all of the following criteria:

(A) Persons who, without this option, would be incarcerated in a correctional institution;

(B) Persons who are convicted of property-related, or drug-or alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;

(C) Persons who are convicted of nonviolent felony offenses;

(D) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;

(E) Persons who do not demonstrate a present or past pattern of behavior indicating violence; and

(F) Persons who do not demonstrate a pattern of committing violent offenses.

Tenn. Code Ann. § 40-36-106(a)(1).

Under the "special needs" provision of the statute, an offender who does not otherwise meet the criteria above "and who would be usually considered unfit for probation due to histories of chronic alcohol or drug abuse or mental health problems, but whose special needs are treatable and could be served best in the community" may be considered eligible for a community corrections sentence. Id. § 40-36-106(c). In making this determination, the trial court must first find that the defendant is eligible for probation and then must determine that (1) the defendant has a history of chronic alcohol, drug abuse, or mental health problems; (2) these factors were reasonably related to and contributed to the defendant's criminal conduct; (3) the identifiable special needs are treatable, and (4) the treatment of the special need could be best served in the community rather than in a correctional institution. State v. Grigsby, 957 S.W.2d 541, 546-47 (Tenn. Crim. App. 1997) (citations omitted).

However, even where a defendant meets the eligibility requirements of the statute, the defendant is not automatically entitled to participate. See State v. Ball, 973 S.W.2d 288, 294 (Tenn. Crim. App. 1998). The defendant "bears the burden of affirmatively showing a 'special need' which could be better addressed in the community." Grigsby, 957 S.W.2d at 547 n.11. Moreover, the trial court is in the best position to ascertain a defendant's amenability to a community corrections program given its ability to observe the defendant's demeanor and characteristics first hand. Id. at 547.

In determining if incarceration is appropriate in a given case, a trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1).  Furthermore, the defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate.  Id. § 40-35-103(5).

The trial court acted appropriately within its discretion in imposing a sentence of confinement.  The record indicates that the Defendant has a lack of potential for rehabilitation given her lifestyle of criminal conduct and failed prior attempts at treatment.  In addition, the increasing number of similar cases mentioned by the trial court in its jurisdiction supports its finding that confinement is necessary both to avoid depreciating the seriousness of the offense and to serve as a deterrent.  The trial court's denial of an alternative sentence is entitled to a presumption of correctness and we affirm.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the sentencing decision of the trial court.

_____
ALAN E. GLENN, JUDGE